UNITED STATES of America,
Plaintiff-Appellee,

v.

Harold James TAYLOR,
Defendant-Appellant.

No. 75–2491.

United States Court of Appeals,
Fifth Circuit.

April 15, 1976.

David B. Byrne, Jr., Montgomery, Ala., for defendant-appellant.

Ira DeMent, U. S. Atty., D. Broward Segrest, Asst. U. S. Atty., Montgomery, Ala., for plaintiff-appellee.

Before MORGAN, CLARK, and TJOFLAT, Circuit Judges.

PER CURIAM:

Harold James Taylor was indicted along with Woodrow Hunter on February 19, 1974, for an alleged violation of 18 U.S.C. § 2113 (armed bank robbery). They were both convicted by a jury on April 23, 1974. Because the trial court erroneously denied Taylor's motion to sever, we reversed his conviction and remanded for a new trial. 508 F.2d 761 (5th Cir. 1975). The second trial lasted

from May 5, 1975, to May 8, 1975. Jury deliberation began on May 7 at 2:30 p.m. At 5:07 p.m. the jury returned for a short consultation with the judge[1] and then returned to deliberate until 6:00 p.m. The jury returned the following morning at 8:55 a.m. and deliberated until 10:20 a.m. when they reported they could not reach a verdict. Judge Varner then gave further instructions[2] and sent

1. THE COURT: Now before you ask any questions, let the record show that the Defendant in the Taylor case and his attorneys and the Government attorneys are in the courtroom. Let me warn you that you should not inform anyone as to how you stand, how you have voted, if you have voted, and it would not be alarming to me if you have not voted. But you have to very careful not to tell the Court and anybody here what you have done back there. All you may do properly is ask a question. And if you try to give me information and give the wrong information the affect of it is to have a mistrial, which means that we would have to simply start all over again, spend all of the money getting all of the witnesses and jurors and another jury would have to consider the case. So, do not tell me how you stand. Do not give me any information about what took place in the jury room. Simply ask the question that you wish to ask if you can do that subject to those instructions.

JUROR: No, sir, you have answered the question.

THE COURT: Have I answered the question you had in mind?

JUROR: Yes, sir.

THE COURT: All right. Now, I am going to tell you this. I am inclined to recess you for the night and let you come back in the morning to continue your deliberations. However, I will give you a few minutes to go back and discuss it among yourselves, and if you have a preference that you stay here tonight and continue your deliberations I will honor that preference for half an hour or so. So, if you will, go back and talk among yourselves. We will go maybe—well, I guess we better do it that way. Go back and talk among yourselves, and if you would like for me to recess you for the night and let you come back in the morning I will be glad to do that now. So, step back into the jury room and do that if you will.

2. THE COURT: As I told you to begin with, we have to be very careful in these cases in discussion. You are not allowed to tell me how you stand in phrasing any question. You can tell me you haven't reached a verdict. You can tell me you don't think you can reach a verdict, but you cannot tell me how you voted, that is, you cannot say there are six of you this way and six that way, or anything of that nature. Do you understand?

JUROR: Yes, sir.

THE COURT: Now, I understand you do have a question you do want to ask me, and I will—while I have discouraged it, I will hear you, and these attorneys—let the record show that the attorneys and the Defendant are in the courtroom—and you may proceed.

JUROR: Judge, we cannot reach a verdict. We haven't reached a verdict and we cannot reach a verdict.

THE COURT: Well, let me say this. The first case I ever tried as a lawyer was an assault with intent to murder case. And a man split the head—or at least hit a woman on the head with an axe and just took the scalp off on one side. And that jury stayed out for eight hours. The judge at that time told me he said, "Bob, these things happen. There are misunderstandings about evidence, there are misunderstandings about why people feel as they do, and it is appropriate that a jury sit and deliberate and think about the way the other side thinks; think about the way that they might think if they were on the other side, and try to rationalize the problems." And he is correct. If we have to try this case again it will be a tremendous imposition on both sides. It will be a tremendous cost to both sides. It will be a tremendous cost to the United States Government and it would be inappropriate for me to excuse you now because you are unable to reach a verdict. Now, let me say this. I realize that it is difficult for you as jurors to swallow the bitter pill and say maybe I spoke too harshly, maybe I shouldn't have said some things I said and maybe I shouldn't have thought some things that I thought. But when you think about the inconvenience to both sides and the expense to both sides of retrying this case maybe it is worthwhile that you each go back and reconsider the things that are worrying you about it and try to consider both sides of the question within your own mind and see if you cannot reach a verdict. Now, I do not want any of you to compromise your conscience. If after a very careful consideration, and it takes a long time to really consider a question like this one, there is a good deal of evidence in this case and it took several days to try it, and I realize that you all have some rather strong feelings about it by now, but I want to be sure that each of you is really rationalizing things with yourself. And I certainly want to be sure when you do finally reach a verdict that you are convinced of it, and I do not want to say anything that will convince you one way or the other, but I hope that you can reconsider it and reevaluate the position you are taking. Reconsider the things that the other jurors are saying; not those things that make you mad, and there are things by this time that you are

the jury back for further deliberation. He allowed them a one-hour recess for lunch at 1:00 p.m.[3] They returned after lunch and reached a verdict at 2:35 p.m. The defendant appeals contending that the supplemental instructions given by Judge Varner were so coercive that they taint the verdict.[4]

The prosecution argues that the issue cannot be raised, because the defense failed to object at trial. In *United States v. Taylor,* 513 F.2d 70, 72 (5th Cir. 1975), we pointed out that when the defendant fails to object to an Allen Charge,[5] the court may reverse under Fed.R.Crim.P. 52(b) only if the charge constitutes plain error, that is, " 'only where the error complained of seriously affects the fairness or integrity of the trial and the appellate court must take notice of it to avoid a clear miscarriage of justice. *Moore v. United States,* 399 F.2d 318, 319 (5th Cir. 1968), cert. denied, 393 U.S. 1098, 89 S.Ct. 893, 21 L.Ed.2d 789.' " To determine whether an Allen charge is plain error, we must evaluate whether the particular charge is coercive in light of the facts and circumstances of the case and whether further instructions following timely objection could correct the problem.

Although this court upheld the use of the Allen charge in *United States v. Bailey,* 480 F.2d 518 (5th Cir. 1973) (en banc), our later cases [6] leave little doubt that our decision was commanded by a Supreme Court decision and was not an expression of our approval of the use of the Allen charge. Consequently, any variation from the classic Allen language will be subject to intense scrutiny. *United States v. Cheramie,* 520 F.2d 325, 330 (1975); *United States v. Amaya,* 509 F.2d 8, 12–13 (5th Cir. 1975). A charge will only survive this scrutiny if after examining the facts and circumstances, the court is convinced that the charge will not coerce the jury. *United States v. Taylor,* 513 F.2d 70, 72 (5th Cir. 1975). *United States v. Cheramie,* 520 F.2d 325, 328 (5th Cir. 1975).

The supplementary charge in this case, including the story of the judge's first case, an assault case in which the defendant had allegedly struck his victim with an ax, is certainly not the classic Allen charge. Examining the charge and surrounding circumstances we must conclude that it was unduly coercive. First, time pressures were created by a variety of factors. After five hours of deliberation, the ax story was told suggesting that the judge would not consider it excessive to hold the jury for more than eight hours. He then did not excuse them for lunch until 1:00 p.m., an hour later than normal and the time at which three of the jurors were due for jury duty on another trial. When a mistrial was not declared at that time, they could have perceived that they were "in for the duration." These time pressures certainly could have coerced members of the jury.

Second, the "ax story" involved long deliberations over a case in which the judge seemed to think there was lit-

---

saying that makes other jurors mad, but try to weed out the things that make you mad and listen to and try to figure the reasoning of the other jurors. Go back in there and try to do that, and I will talk to you later about it.

3. He addressed the jury briefly at that time: Ladies and gentlemen, I am sorry that I neglected to excuse you for lunch until this late. I hope you haven't been too hungry, but if you will now go ahead and recess, have lunch, do not talk even among yourselves about the case, come back here and go directly to the jury room to recommence you deliberations after lunch. I would think that—is an hour enough time? You have been through this

several times. Come back then about two and go on back to the jury room. Thank you.

4. The defendant raises several other issues, but because of the disposition of this case, we find it unnecessary to reach those issues.

5. The term "Allen Charge" is commonly used to refer to supplemental charges given to deadlocked juries encouraging jurors to reconsider their position. The use of one such charge was approved in *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

6. *See, e. g., United States v. Amaya,* 509 F.2d 8 (5th Cir. 1975).

**52**

tle doubt. By repeating it here, he suggests that the *Taylor* case is an easy one. Thus, if the minority was holding out for the defendant in this case, they might be more easily persuaded to change their positions if they thought the defendant was probably guilty but were not convinced beyond a reasonable doubt. Third, the trial judge strongly emphasized to the jury that another trial would involve enormous expense and inconvenience. These statements could scarcely have avoided creating the impression that there might be something "improper, questionable, or contrary to a good conscience for a juror to cause a mistrial . . . ." *Thaggard v. United States*, 354 F.2d 735, 739 (5th Cir. 1965), *cert. denied*, 383 U.S. 958, 86 S.Ct. 1222, 354 F.2d 735 (1966). Taken in combination, these factors lead to the conclusion that the charge may have been coercive and therefore reversible error. This error is plain error unless instructions could have cured the error. We believe, however, that where a judge has created time pressures and has implied his opinion of the correct outcome of the case, no further instructions could have undone the problem.

Accordingly, we REVERSE and REMAND for a new trial.