GLOBE NEWSPAPER COMPANY *vs.* SUPERIOR COURT.

Suffolk. March 2, 1981. — June 30, 1981.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & NOLAN, JJ.

*Constitutional Law*, Public trial, Freedom of speech and press. *Practice, Criminal*, Public trial. *Witness*, Victim.

Discussion of the United States Supreme Court's decision in *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555 (1980). [842-845]

General Laws c. 278, § 16A, as construed in *Globe Newspaper Co.* v. *Superior Court*, 379 Mass. 846 (1980), to mandate that a trial for rape, incest, carnal abuse or other crime involving sex be closed to the public only during the testimony of a minor complainant and to permit closure of other portions of such a trial only after a hearing at which all interested parties could appear, and as reviewed in light of the United States Supreme Court's decision in *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555 (1980), does not violate the First Amendment to the United States Constitution; [845-852] WILKINS, J., concurring, would require specific findings in each case before a trial may be closed during the testimony of a minor victim of a sex crime and would not foreclose the trial judge from concluding on proper findings, that a trial should be entirely public [852-853].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on April 25, 1979.

The case was heard by *Braucher*, J.

After review by the full court and appeal to the Supreme Court of the United States, the case was remanded by that Court for further consideration.

*James F. McHugh* (*Jane E. Serene* with him) for Globe Newspaper Company.

*Mitchell J. Sikora, Jr.*, Assistant Attorney General (*Alan B. Sherr*, Assistant Attorney General, with him) for the defendant.

*James C. Heigham* for Massachusetts Newspaper Publishers Association, amicus curiae, submitted a brief.

LIACOS, J.   This case is before us on remand from the United States Supreme Court, *Globe Newspaper Co.* v. *Superior Court,* 449 U.S. 894 (1980).   The order of the Supreme Court vacated the judgment in *Globe Newspaper Co.* v. *Superior Court,* 379 Mass. 846 (1980) (*Globe I*). The Court remanded the cause for further consideration by this court in light of *Richmond Newspapers, Inc.* v. *Virginia,* 448 U.S. 555 (1980).   In *Richmond Newspapers,* the Supreme Court recognized for the first time that the First Amendment to the United States Constitution guarantees a right of public access to criminal trials.   We hold that G. L. c. 278, § 16A, as construed in *Globe I,* is constitutional under the First Amendment to the Federal Constitution.

The underlying facts of this case are set forth in detail in our original opinion,[1] but for the sake of clarity we provide a brief summary.   In mid-April of 1979, preliminary motions were argued in the case of Commonwealth *vs.* Albert Aladjem, Superior Court, Norfolk County, No. 73102-9 (1978).   Aladjem was accused of forcible rape and forced unnatural rape.   Three complaining witnesses were involved, all minors, two sixteen and one seventeen years of age at the time of trial. The presiding judge ordered the hearings on preliminary motions closed to the public and press, and the prohibition continued throughout the entire trial. A jury verdict of not guilty was delivered on May 10, 1979. The closure order, issued without hearing,[2] was based on the conclusion of the trial judge that G. L. c. 278, § 16A, required such action. The statute in relevant part reads as follows: "At the trial of a complaint or indictment for rape, incest, carnal abuse or other crime involving sex, where a minor under eighteen years of age is the person upon, with or against whom the crime is alleged to have been committed, . . . the presiding justice shall exclude the general

---

[1] The facts are as stated in the initial petition of the plaintiff. They were not disputed by the defendant and have been accepted as accurate throughout the various proceedings in this case.

[2] The Globe sought to intervene but its request was denied.

public from the court room, admitting only such persons as may have a direct interest in the case."

Following the action of the Superior Court judge, the plaintiff, Globe Newspaper Company (Globe), sought from a single justice of this court, an order permitting members of the press to attend the trial and related proceedings. G. L. c. 211, § 3. After hearing the parties, the single justice denied the relief sought. The Globe appealed to the full court. In that appeal, the Globe raised statutory and constitutional claims. We held that the case was moot, since the criminal trial already had ended in acquittal. We declined, for a number of reasons, to reach the constitutional issues raised by the Globe.[3] Still, recognizing that the issue before us was one capable of repetition yet evading review, the opinion did delineate our view as to the proper interpretation of G. L. c. 278, § 16A. We held that the statute mandated closure only during the testimony of minor complainants. We also indicated that requests to exclude the public from additional segments of a trial were matters to be considered within the sound discretion of the trial judge. We suggested that a judge should consider whether closure was necessary to protect the State's interest in preserving evidence and obtaining just convictions; such a request should be granted only after a hearing where any person to be excluded, including representatives of the press, could be heard.

The Globe now claims that *Richmond Newspapers* dictates a different result. No party contests that there are instances where a minor victim may be psychologically unable to testify if confronted with a large group of spectators or if the minor is aware that what is being said will become a

---

[3] The plaintiff in *Globe I*, failed to fully brief or argue any claim based on art. 16 of the Declaration of Rights of the Massachusetts Constitution and thus we did not consider this contention. The pendency of a decision in *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555 (1980), and the uncertainty engendered by *Gannett Co.* v. *DePasquale*, 443 U.S. 368 (1979), were among the reasons that led us to refrain from reaching the Federal constitutional issues.

matter of wide public knowledge. But in the plaintiff's
view such a determination can be constitutional only if
made in a case-by-case manner after a hearing has been
held at which interested parties (the Commonwealth, the
defendant, members of the public, including the press) have
presented evidence. The automatic closing of a minor vic-
tim's testimony would thus be prohibited. Additionally,
the plaintiff challenges the standards set forth in *Globe I* for
the closing of other portions of such trials, arguing that ade-
quate weight was not given in this court to the interests of
the press and public.

The plaintiff predicates its argument on its own rights
under the First Amendment, as applied to the States by the
Fourteenth Amendment. See, e.g., *Fiske* v. *Kansas*, 274
U.S. 380 (1927) (freedom of speech); *Near* v. *Minnesota ex
rel. Olson*, 283 U.S. 697 (1931) (freedom of the press); *De-
Jonge* v. *Oregon*, 299 U.S. 353 (1937) (freedom of assem-
bly).[4] The Globe also suggests that it should be allowed to
assert the Sixth Amendment rights of Aladjem, who was the
defendant in the underlying criminal prosecution, and who
opposed the closing of the trial to the press and public. Cf.
*In re Oliver*, 333 U.S. 257 (1948) (right to public trial). In
*Globe I*, we rejected this proposition since the accused, hav-
ing objected to the closure order, chose not to pursue the

---

[4] The defendant points out, with some justification, that the only issue
technically before us on remand may be whether the plaintiff's claims
were indeed moot in the initial proceeding. If the answer is yes, as a mat-
ter of Federal constitutional law, there is no need for us to resolve the
plaintiff's substantive contentions. Indeed there is some debate over the
propriety of a State court resolving a Federal claim in such circumstances.
See L. Tribe, American Constitutional Law § 3-18, at 81 (1978). How-
ever, both in *Gannett Co.* v. *DePasquale, supra*, and *Richmond News-
papers, Inc.* v. *Virginia, supra*, the Supreme Court considered claims by
news organizations arising from the closing of trials or pretrial sessions in
cases that had long since concluded. We pointed out in *Globe I, supra* at
848, that the case before us was one "capable of repetition yet evading
review," citing *Southern Pac. Terminal Co.* v. *ICC*, 219 U.S. 498, 515
(1911). In light of these considerations, and of the mandate implicit in
the remand of the Supreme Court to this court, we conclude that the case
is not moot as to the First Amendment issues.

claim after acquittal. We continue to believe that these personal rights, at least in the context of this case, can only be asserted by the original criminal defendant.[5]

A resolution of the issues raised by the plaintiff requires a close reading of *Richmond Newspapers*. The question facing the Supreme Court was whether the public and press possess a constitutional right to attend criminal trials. *Id.* at 563-564 (plurality opinion).[6] A trial judge in a small Vir-

---

[5] The plaintiff finds authority for its contention in those decisions of the United States Supreme Court that have allowed a third party to assert the rights of individuals not before the court. See, e.g., *Eisenstadt* v. *Baird*, 405 U.S. 438, 445-446 (1972); *Griswold* v. *Connecticut*, 381 U.S. 479, 481 (1965). The weakness of this argument however is that *Griswold* pointed to the existence of a "professional relationship" between the party before the court and the individuals whose rights were asserted. In *Eisenstadt*, a somewhat similar relationship was present as well as a situation where a finding against the party before the court would have significantly impaired the right of the absent parties to later assert their rights. *Id.* at 446. So, too, in cases where third-party standing has been allowed, there generally has not been a single individual whose interests are purportedly being protected but rather some group, if not a certified class. When the absent party, as here, is an identified individual fully competent to protect his rights, there is little reason to allow surrogate standing. See *Gilmore* v. *Utah*, 429 U.S. 1012, 1017 (1976) (Stevens, J., concurring) (order dismissing stay of execution); Brilmayer, The Jurisprudence of Article III: Perspectives on the "Case or Controversy" Requirement, 93 Harv. L. Rev. 297, 310-315 (1979).

We note also that the various opinions in *Richmond Newspapers* are based on the First Amendment, not the Sixth Amendment. Hence, we consider the mandate in the remand to require us to consider First Amendment issues only.

[6] The precise basis of the Supreme Court's decision in *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555 (1980), is somewhat unclear. It appears the Sixth Amendment right to a public trial was not relied upon (see note 5, *supra*), and that the essential underpinnings of the decision are found in the First Amendment. The difficulties of interpretation are expressed by Justice Blackmun, concurring in the judgment: "The Court, however, has eschewed the Sixth Amendment route. The plurality turns to other possible constitutional sources and invokes a veritable potpourri of them — the Speech Clause of the First Amendment, the Press Clause, the Assembly Clause, the Ninth Amendment, and a cluster of penumbral guarantees recognized in past decisions. This course is troublesome, but it is the route that has been selected and, at least for now, we must live with it. No purpose would be served by my spelling out at length here the reasons for my saying that the course is troublesome. I need do no more

ginia community had excluded both press and public from the third retrial of a murder case. The closing, on motion by the defense attorney and without objection from the prosecution, was ordered without a hearing on the basis of a statute that placed discretionary authority in the hands of the judge.[7]

The Chief Justice and six Justices agreed that the decision to close was improper. Although there was no majority opinion,[8] two themes were stressed by all. The unbroken common law history of open trials was central in the plurality opinion of Chief Justice Burger, joined by Justices White and Stevens. *Id.* at 564-575. While such a tradition alone does not create a constitutional right in the public and press to attend trials, it was viewed by these Justices in conjunction with the First Amendment's "core purpose of assuring freedom of communication on matters relating to the functioning of government." *Id.* at 575. The Chief Justice found it "difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Id.* The plurality opinion describes an open court room as akin to a public forum protected by freedom of assembly, *id.* at 578, and as a critical source of information about the functioning of government, *id.* at 575. This concern with the history of unimpeded access was shared by Justice Blackmun, although he would have found the locus of the public right in the open trial provisions of the Sixth Amendment. *Id.* at

than observe that uncertainty marks the nature — and strictness — of the standard of closure the Court adopts." *Id.* at 603.

[7] The plurality considered the challenge to be aimed at the manner in which the trial judge exercised his discretion rather than at the statute itself (Va. Code § 19.2-266 [1975]). *Id.* at 562 n.4. Justice Brennan, joined by Justice Marshall, would have held the statute itself unconstitutional since it conferred unfettered discretion. *Id.* at 598.

[8] There is some difficulty in determining the binding rule of law in a decision which lacks reasoning to which a majority of the Court has agreed. See Note, Plurality Decisions and Judicial Decisionmaking, 94 Harv. L. Rev. 1127 (1981); Note, The Precedential Value of Supreme Court Plurality Decisions, 80 Colum. L. Rev. 756 (1980).

603-604. Justice Stewart also adopted the historical analysis, emphasizing in particular the concept of the public forum. *Id.* at 599-600.

Justice Brennan, joined by Justice Marshall, accepted the importance of tradition, *id.* at 585-589, but placed more emphasis on the structural role of the First Amendment in ensuring public access to information necessary for self-government. *Id.* at 593-597. Justice Stevens shared this position in a separate concurrence, expressing the belief that the major significance of the decision was that the First Amendment was now recognized as creating some affirmative right of access to information in the hands of the government. *Id.* at 583.

All the members of the Court voting for reversal[9] indicated that there were circumstances where the closing of portions of a trial would be justified. Less clear are the particular instances. There is also little direction about the level of opposing interests necessary to exclude the press and public. The Globe points to a passage in the plurality opinion, "Absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public," *id.* at 581. However, attached to that statement is a footnote in which the plurality disavows any attempt to define the exact circumstances in which trials may be closed.[10]

---

[9] Justice Powell took no part in the Court's decision. Justice Rehnquist dissented.

[10] See *Richmond Newspapers, supra* at 581 n.18. The footnote acknowledges that some situations have in the past been seen as justifying the closing of a trial. The Court referred to 6 J. Wigmore, Evidence § 1835 (Chadbourn rev. 1976), and stated that the Court's holding "does not mean that the First Amendment rights of the public and representatives of the press are absolute." Justices Brennan and Marshall, concurring, also recognized that "countervailing interests" might be sufficient to reverse the presumption favoring open trials. *Id.* at 598 & n.24. That the First Amendment is not an absolute bar to closure was also recognized by Justice Stewart, concurring, *id.* at 600 & n.5. Cf. *id.* at 605-606 (Rehnquist, J., dissenting). It seems significant to us that Wigmore states in § 1835 that: "The danger of overcrowding, the risk of violence or brawls, the moral harm of satisfying pruriency in trials of certain crimes — these

Justice Brennan's concurrence cautions that a right to governmental information is not absolute but rather subject to "a degree of restraint dictated by the nature of the information and countervailing interests in security or confidentiality," *id.* at 586. Justice Stewart specifically pointed to the "sensibilities of a youthful prosecution witness" in a rape case as an example of a circumstance which might justify the exclusion of the general public. *Id.* at 600 n.5.

To test the mandatory closing requirement of G. L. c. 278, § 16A, against the standard of *Richmond Newspapers* requires a threefold inquiry: (1) Does the closing of the testimony of the minor victim of a sexual assault[11] violate the same tradition of open proceedings as the closing of an entire murder trial; (2) to what extent does the restriction impede the flow of information necessary to the functioning of democratic institutions; (3) are there substantial State interests underlying the statute, and if there are, can they be furthered by more tightly drawn regulations that will intrude to a lesser degree on the constitutionally protected interests of the press and public?

As already discussed, the constitutional right of access to trials arises in part from an unbroken tradition of openness. See *Globe I, supra* at 855-856. The thrust of the separate opinions in *Richmond Newspapers* is not that the ability or inability of a judge to close a proceeding in 1791 was enshrined unchanging in the Constitution. Rather the vital role of public proceedings in providing information about the operation of government, with a corresponding right to this "public forum," has developed over time. This tradition of open trials long has been a part of the common law

---

are the ordinary grounds for exclusion. It cannot be doubted that such exceptions are within the judicial power to allow.

"By statute in most states they are expressly sanctioned, either in general terms, or for *special classes of cases*, such as divorce, rape, and the like, or for *special classes of persons*, such as minors" (emphasis in original). 6 J. Wigmore, *supra* at 443-445.

[11] We consider here only the crimes within the scope of G. L. c. 278, § 16A, involved in the trial of Aladjem.

of this Commonwealth, and we took cognizance of it in *Globe I.* There is at least one notable exception to this history. In cases involving sexual assaults, portions of trials have been closed to some segments of the public, even when the victim was an adult. See, e.g., *United States ex rel. Latimore* v. *Sielaff,* 561 F.2d 691 passim (7th Cir. 1977), cert. denied, 434 U.S. 1076 (1978) (court closed to the public during testimony of twenty-one year old rape victim [press allowed to remain]); *Harris* v. *Stephens,* 361 F.2d 888, 891 (8th Cir. 1966), cert. denied sub nom. *Harris* v. *Bishop,* 386 U.S. 964 (1967) (closing of rape trial to the public during testimony of twenty-three year old victim); *Benedict* v. *People,* 23 Colo. 126, 128-129 (1896) (in a trial for sodomy, judge properly excluded the general public); *Douglas* v. *State,* 328 So. 2d 18, 20-21 (Fla.), cert. denied, 429 U.S. 871 (1976) (court closed to general public during witness's testimony concerning forced sex acts [press allowed to remain]); *State* v. *Callahan,* 100 Minn. 63, 69 (1907) (upholding clearing of court room of spectators when rape victim found it difficult to testify in front of a large crowd); *Price* v. *State,* 496 S.W.2d 103, 107-108 (Tex. Crim. App. 1973) (court cleared during testimony of rape victim [representative of press allowed to remain]). But see, e.g., *Tanksley* v. *United States,* 145 F.2d 58 (9th Cir. 1944) (reversing trial court decision barring public [but not the press] from an entire trial involving a nineteen year old rape victim); *People* v. *Byrnes,* 84 Cal. App. 2d 72, cert. denied, 335 U.S. 847 (1948) (reversing conviction of rape when public was excluded from entire trial); *State* v. *Schmit,* 273 Minn. 78 (1966).

To the extent such closings were justified as an attempt to protect the public from offensive information, see *Douglas* v. *State, supra,* such rulings can hardly survive the rationale of *Richmond Newspapers.* More typically, however, the motivation has been overcoming the difficulty the victim may have in publicly testifying about the details of crimes which are, short of homicide, the "ultimate violation of self." *Coker* v. *Georgia,* 433 U.S. 584, 597 (1977) (plurality

opinion). Accord, *State* v. *Callahan*, *supra*; *Price* v. *State*, *supra*. A part of this willingness to close testimony of the victim of a sexual assault is for the "protection of the personal dignity of the complaining witness." *United States ex rel. Latimore* v. *Sielaff*, *supra* at 694.

Historically there has been a recognition that significant interests are at stake in a trial involving a sexual assault, interests that may outweigh the public's right to unfettered access to the trial.[12] Disputes have concerned the extent of closings or the justification in a particular fact situation. See *id.* at 694-696. Whatever the disagreement among the courts about specific closure orders, it is clear that the majority of the courts have upheld decisions to close parts of trials when a minor victim of a sexual assault is testifying. *Gannett Co.* v. *DePasquale*, 443 U.S. 368, 388 n.19 (1979). *Geise* v. *United States*, 262 F.2d 151 (9th Cir. 1958), cert. denied, 361 U.S. 842 (1959). *Hogan* v. *State*, 191 Ark. 437 (1935). *State* v. *Nyhus*, 19 N.D. 326 (1909). But see *Lexington Herald Leader Co.* v. *Tackett*, 601 S.W.2d 905 (Ky. 1980). While this tradition alone does not answer the plaintiff's claim, it shows widespread recognition that legitimate and significant interests in closing at least portions of trials for sexual assaults do exist.

General Laws c. 278, § 16A, as interpreted in *Globe I*, limits immediate public observance of a particular kind of testimony. The court room testimony of minors who are the victims of sexual assault cannot be subject to contemporary reporting by members of the press. When the victim is an adult the trial is not automatically closed.[13] The

---

[12] The multitude of jurisdictions which specifically authorize courts to close proceedings involving sexual assaults strengthens this perception. See, e.g., Ala. Code tit. 12, § 12-21-202 (1975); N.Y. Jud. Law § 4 (McKinney) (1975); N.C. Gen. Stat. § 15-166 (1975).

[13] General Laws c. 278, § 16C, authorizes the exclusion of the general public from trials involving incest or rape, even when the victim is an adult. We need not here pass on the particular applications of that statute except to point out that it is discretionary, and we expect that trial judges will interpret it in light of *Globe I*, this opinion, and *Richmond Newspapers*.

public will therefore be able generally to observe the judicial system dealing with charges involving sexual assault. The Legislature has chosen, however, to treat the testimony of minors in a different way by requiring closure of the trial at the time the minor testifies.[14] The question we must resolve is whether the genuine State interests furthered by the statute justify this impact on First Amendment interests. In *Globe I* we identified the State interests furthered by G. L. c. 278, § 16A, to be, (a) to encourage minor victims to come forward to institute complaints and give testimony (*id.* at 857); (b) to protect minor victims of certain sex crimes from public degradation, humiliation, demoralization, and psychological damage (*id.* at 857-859); (c) to enhance the likelihood of credible testimony from such minors, free of confusion, fright, or embellishment (*id.* at 859-860); (d) to promote the sound and orderly administration of justice (*id.* at 860); (e) to preserve evidence and obtain just convictions (*id.* at 860-861, 864).

The plaintiff does not deny that significant State interests may warrant closure of a trial; it argues, however, that such interests cannot be furthered by legislative mandate. The plaintiff says that a balancing of State interests against First Amendment rights is permissible only if undertaken on a case-by-case basis. We do not agree. We perceive no such holding in *Richmond Newspapers*. We believe that the Legislature, a coordinate branch of government, has power to act. We note additionally that, by their very nature, these substantial State interests would be defeated if a case-by-case determination were used. Ascertaining the susceptibility of an individual victim might require expert testimony and would be a cumbersome process at best. Only the most exceptional minor would be sanguine about the

---

[14] We note that G. L. c. 278, § 16A, is silent as to the question of transcripts of such testimony being made available to the press; nor did we discuss this question in *Globe I*. We need not resolve that issue here, but leave the question to the sound discretion of trial judges in light of our discussion in *Globe I* and this opinion, and, of course, in light of *Richmond Newspapers*.

possibility that the details of an attack may become public. An examiner would have to distinguish between natural hesitancy and cases of particular vulnerability. To the extent that such a hearing is effective, requiring various psychological examinations in some depth, the victim will be forced to relive the experience.[15] So, too, the families of youthful victims will be uncertain whether the reporting of a sexual assault will expose a child to additional trauma caused by the preliminary hearing as well as to public testimony at the trial. Implicit also in the Globe's argument is that a State Legislature is without power to act to protect substantial State interests in the context of such trials. We do not believe *Richmond Newspapers* goes that far (see note 7, *supra*) and we are not disposed to reach such a conclusion.

Next, the plaintiff contends that even if legitimate ends are in part served by G. L. c. 278, § 16A, the statute is "underinclusive" and hence must fall. Cf. *Smith* v. *Daily Mail Publishing Co.*, 443 U.S. 97, 104-105 (1979); *Erznoznik* v. *Jacksonville*, 422 U.S. 205, 214-215 (1975). It is true that an attempt possibly could be made to give more complete protection to minor victims of sexual assaults. The statute as it stands is only a partial solution since the names of the victims are not part of a closed record. However, G. L. c. 278, § 16A, is aimed at balancing the defendant's Sixth Amendment rights, see generally *Commonwealth* v. *Marshall*, 356 Mass. 432, 435 (1969), and the public's right

---

[15] The plaintiff's suggestion at oral argument that a case-by-case approach to determine psychological vulnerability would require press participation in the resolution of this question makes the point more dramatic. As envisioned by the plaintiff, the press should be allowed to participate and to present evidence. To adopt such a view would lead not only to a side trial in addition to the criminal trial, but a trial in which the victim would be the focus of conflicting psychiatric testimony and perhaps examination and cross-examination. We can perceive no procedure more damaging to the well-being of the child; nor one better designed to inhibit criminal complaints and convictions in such cases. For the same reasons, a waiver provision would be inappropriate. To determine whether the witness's decision to testify in public was knowing would require the same kind of potentially damaging inquiry. See *Globe I, supra* at 861 n.21, for additional reasons which make a theory of waiver inappropriate.

to know under the First Amendment, against the minor victim's right to minimal harm in the process of testifying, and the Commonwealth's substantial interests as outlined herein. In this light, the statute cannot be said to be fatally underinclusive.

An additional factor that supports the challenged closing is the specific State interest in protecting minors. As we pointed out in *Globe I, supra* at 858: "This legislative history reveals that G. L. c. 278, § 16A, stands at the nexus of two overlapping strands of policy; the Legislature wished to shield certain victims of sex crimes from the difficult experience of testifying in public; and the Legislature joined this solicitude for victims with the broad, paternal protection afforded children generally" (footnotes omitted). This well-established State interest does not overwhelm all other constitutional concerns. There is no doubt that once a news organization legitimately obtains information concerning a juvenile offender or victim, the State may not penalize the publication of such information. *Smith* v. *Daily Mail Publishing Co., supra* at 104. *Oklahoma Publishing Co.* v. *District Court,* 430 U.S. 308 (1977). *Cox Broadcasting Corp.* v. *Cohn,* 420 U.S. 469, 495 (1975). Similarly, by virtue of the Sixth Amendment, a defendant cannot be prevented from confronting a witness with prior offenses merely because the adjudication of guilt occurred in a juvenile proceeding. *Davis* v. *Alaska,* 415 U.S. 308, 319 (1974). Yet in both the juvenile justice system and in the Commonwealth's dealings with the problem of neglected or abused children there is a clear recognition that the State may act in a manner that otherwise would be forbidden because of a special solicitousness for the interests of minors. See, e.g., *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, ante* 573, 587-588 (1981); *McKeiver* v. *Pennsylvania,* 403 U.S. 528, 545-549 (1971) (plurality opinion). We are given no authority indicating that a State may not close juvenile delinquency proceedings to protect allegedly delinquent juveniles from stigmatization and to

further State interests in the rehabilitation of juveniles.[16] General Laws c. 278, § 16A, must be viewed as part of the same scheme. *Globe I, supra* at 858. It would be anomalous indeed if a State Legislature could protect juvenile offenders by closed hearings but was deemed to lack the power to protect juvenile victims of crime. We do not believe that *Richmond Newspapers* dictates such an anomalous result.

The statute, as it affects the testimony of minor victims, is fairly characterized as an attempt to reduce possible harm to a vulnerable group of individuals. Both precedent and empirical research support the Commonwealth's position that this concern is genuine and well-founded. *Globe I, supra* at 858-861. Logic and history indicate that the method chosen by the State will further this goal, while making increased reporting of sexual assaults more likely.

Balanced against this must be the impact that the closing of this testimony has on the public's knowledge about these trials. Although there is some temporary diminution of information, we cannot say that *Richmond Newspapers* requires the invalidation of the requirement, given the statute's narrow scope in an area of traditional sensitivity to the needs of victims.

The plaintiff also challenges the standards set forth in *Globe I* for the closing of additional portions of a trial involving a sexual assault on a minor victim. We required that a hearing be held at which all interested parties could appear. *Globe I, supra* at 865. Certainly a trial judge in such a hearing is now obliged to recognize the constitutional right of the press and public to attend trials. The justification for such exclusion must comply with the standards of *Richmond Newspapers*. We decline, however, at this point, to go further in articulating the requirements of the First Amendment. Our opinion in *Globe I* made clear that the closing of the entire trial in this instance was improper since no hearing was conducted. Having made such a determination on the basis of the statute, there is no need

---

[16] See statute and authorities cited in *Globe I, supra* at 858 n.10.

to reach additional, constitutional issues. See *Fazio* v. *Fazio*, 375 Mass. 394, 405 (1978); *Commonwealth* v. *Bartlett*, 374 Mass. 744, 748-749 (1978).

Accordingly, we conclude that the opinion of this court in *Globe I* is valid, and we dismiss the appeal before us.

*So ordered.*

WILKINS, J. (concurring). I agree with most of what the court has said. *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555 (1980), did not involve the closing of a trial, or a portion of a trial, which involved a minor victim of a sex crime. Various Justices noted that the right to a public trial was not absolute, recognizing that overriding or countervailing interests might overcome the general principle that a criminal trial must be open to the public.[1] We have no guidance yet on whether the mandatory closing of all criminal trials during the testimony of minor victims of sex crimes is permissible under the First Amendment. Justice Stewart recognized that "the sensibilities of a youthful prosecution witness, for example, might justify similar exclusion [at least from some segments of a trial] in a criminal trial for rape, so long as the defendant's Sixth Amendment right to a public trial were not impaired." *Id.* at 600 n.5.

I am not certain that the mandatory closing of the trial of a case involving a minor victim of a sex crime during his or her testimony, as the court directs, is constitutionally permissible without specific findings by the judge that the closing is justified by overriding or countervailing interests of the Commonwealth. I question whether the findings, imputed to the Legislature, in support of closing such trials can alone justify closing a portion of all such trials. The applicability of these imputed legislative findings in each case is

---

[1] See *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555 (1980) (Chief Justice Burger, joined by Justice White and Justice Stevens); *id.* at 584 (Justice Brennan, concurring, joined by Justice Marshall); *id.* at 598 n.5 (Justice Stewart, concurring).

not assured. If, for example, the minor victim did not object to the trial being public during his or her testimony and the defendant wanted the entire trial to be public, or, to make the case perhaps even stronger, if the minor victim wanted the public to know precisely what a heinous crime the defendant had committed, the imputed legislative justifications for requiring the closing of the trial during the victim's testimony would in part, at least, be inapplicable. In such a case, the reasons for closing a portion of the trial would be far less persuasive than in a case in which the victim wanted the trial closed during his or her testimony. I would require specific findings in each case before a trial may be closed during the testimony of a minor victim of a sex crime and would not foreclose the trial judge from concluding, on proper findings, that a trial should be entirely public.